## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ZURICH AMERICAN INSURANCE COMPANY**, and **AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY** 1299 Zurich Way Schaumburg, Illinois 60196 | CIVIL ACTION NO.: |
| Plaintiffs, | |
| v. | |
| **THOMAS P. CARNEY, INC.** 2490 Village Rd Langhorne, PA 19047, | **CIVIL ACTION COMPLAINT** |
| Defendant. | |

## COMPLAINT FOR DECLARATORY JUDGMENT
## AND OTHER RELIEF

Plaintiffs, Zurich American Insurance Company ("ZAIC") and American Guarantee and

Liability Insurance Company ("AGLIC" and, together with ZAIC, "Zurich"), by and through

their attorneys, Bodell Bove, LLC, for their Complaint for Declaratory Judgment and Other

Relief against Defendant, Thomas P. Carney, Inc., aver as follows:

## NATURE OF THE ACTION

1.      Zurich brings this Complaint for Declaratory Judgment and Other Relief seeking

a judicial declaration, pursuant to Federal Declaratory Judgment Act, 28 U.S.C. §2201, *et seq*.,

that Zurich has no duty to defend or indemnify Thomas P. Carney, Inc. ("Carney") in the

underlying consolidated actions styled *Chestlen Development, LP v. Tutor Perini Building Corp*.,

Philadelphia Court of Common Pleas ("PCCP"), January Term, 2021, No. 00645 (the "*Chestlen*

Lawsuit") and *Tutor Perini Building Corp. v. Chestlen Development, LP*, PCCP December Term,

2020, No. 00207 (the "*Tutor Perini* Lawsuit" and, together with the lead *Chestlen* Lawsuit, collectively, the "Lawsuit") under the Contractor Controlled Insurance Program Policies issued by Zurich to Tutor Perini Corporation (as defined more specifically *infra*, the "Zurich CCIP Policies"), and to recover the defense costs Zurich advanced on behalf of Carney under reservation of rights relative to Carney's defense in the *Tutor Perini* Lawsuit.

2.      The underlying Lawsuit arises out of delays and alleged construction deficiencies which occurred during the construction of a dual branded Element and W Hotel Philadelphia, located at 1441 Chestnut Street in Philadelphia, Pennsylvania (the "Project") and, relatedly, disputes by the various contractors involved in that Project over entitlement to payment.

3.      In the lead action, the developer of the Project, Chestlen Development, LP ("Chestlen"), filed suit against the construction manager for the Project, Tutor Perini Building Corp. ("TPBC"), <u>prior</u> to the Project's completion claiming that TPBC's mismanagement of the Project caused it to incur remediation expense to correct deficient work and resultant delays in completion of the Project.  Chestlen seeks liquidated damages for the continuing delay in completion of the Project as well as other consequential damages incurred during the course of construction of the Project on account of TPBC's alleged breach of the construction management agreements.

4.      TPBC filed the *Tutor Perini* Lawsuit against Chestlen seeking to recover unpaid sums for construction costs, and a "Joinder Complaint" in that same action against two of TPBC's subcontractors on the Project, Carney and Ventana DBS, LLC ("Ventana"), and their respective sureties advancing derivative liability claims on Chestlen's principal claims and asserting these subcontractors (or their sureties) are liable over to TPBC on Chestlen's claims on account of deficiencies and delays in performing their subcontracted work at the Project.

5.      Coverage under the Contractor Controlled Insurance Program ("CCIP") purchased by Tutor Perini Corporation is designed to afford coverage for "bodily injury" and "property damage" (other than to the project itself) in favor of enrolled members during the construction of the project and, then, "property damage" within the products-completed operations hazard after the project is completed, when caused by a covered "occurrence". The Zurich CCIP Policies are not designed to—nor do those policies cover—"property damage" to the project itself during the course of construction. Hence, these policies are specifically endorsed to include a course of construction property damage exclusion ("COCE").

6.      TPBC, Carney, and Ventana each tendered the defense of the Lawsuit to Zurich, and in response to each tender Zurich advised that the Zurich CCIP Policies do not insure against or provide coverage for, *inter alia*, any liability, damage, loss, cost or expense while the Project is under the course of construction, consistent with the express terms of the COCE. Zurich nonetheless agreed to advance defense costs incurred by TPBC, Carney, and Ventana through counsel of their own choosing, subject to a full reservation of rights including, *inter alia*, the right to recover those defense costs Zurich advanced in a separate coverage action.

7.      Following the liability phase of the bench trial in the Lawsuit, the Honorable James C. Crumlish, III found that TPBC is liable to Chestlen for the deficiencies in the work and related remediation expenses during the Project's construction and the resultant delays in completing the Project, and that Carney is liable for failure to perform the work under its subcontract properly and delays in the completion of the Project. Judge Crumlish absolved Ventana from any liability for impacts to its work during the Project's construction or the resultant delays in completing that work.

8.      On November 18, 2025 The United States District Court for the Central District of California held that the COCE precludes a defense or indemnity obligation for the claims in the Lawsuit, and declared that Zurich has no duty to defend or indemnify Tutor Perini Corporation and TPBC (collectively, "Tutor Perini") under the Zurich CCIP Policies.  On November 21, 2025, the court entered a final judgment in favor of Zurich and against Tutor Perini awarding Zurich full reimbursement of the defense costs Zurich advanced on behalf of TPBC in the Lawsuit.

9.      Zurich now seeks the same declaratory relief, relative to the same underlying claims under the same policies, as regards to its obligations to defend Carney in the Lawsuit under the Zurich CCIP Policies, and to recover the defense costs Zurich advanced on behalf of Carney in the Lawsuit.

### THE PARTIES

10.     Plaintiff Zurich American Insurance Company ("ZAIC") is a New York corporation engaged in the insurance business with a statutory home office located at 4 World Trade Center, 150 Greenwich Street, New York, New York 10007, and its principal place of business located at 1299 Zurich Way, Schaumburg, Illinois 60196.  It is authorized to transact business and has transacted business in the Commonwealth of Pennsylvania and is a citizen of New York and Illinois.

11.     Plaintiff American Guarantee and Liability Insurance Company ("AGLIC" and together with ZAIC, "Zurich") is a New York corporation engaged in the insurance business with a statutory home office located at 4 World Trade Center, 150 Greenwich Street, New York, NY 10007, and its principal place of business located at 1299 Zurich Way, Schaumburg, Illinois

60196.  AGLIC is authorized to transact business and has transacted business in the

Commonwealth of Pennsylvania and is a citizen of New York and Illinois.

12.    Thomas P. Carney, Inc. ("Carney") is a Pennsylvania corporation with its

principal place of business located in the Commonwealth of Pennsylvania at 2490 Village Road,

Langhorne, PA 19047.  Carney is a citizen of the Commonwealth of Pennsylvania.

## JURISDICTION AND VENUE

13.    This court has original jurisdiction under 28 U.S.C. §1332, in that this is a civil

action between citizens of different states in which the matter in controversy exceeds the sum of

$75,000, exclusive of interest and costs.

14.    Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C.

§1391(b)(1) because it is the judicial district in which the sole defendant in this action resides.

## FACTS COMMON TO ALL COUNTS

### A.    THE LAWSUIT

15.    The underlying Lawsuit arises out of delays and alleged construction deficiencies

which occurred during the construction of a dual branded Element and W Hotel Philadelphia,

located at 1441 Chestnut Street in Philadelphia, Pennsylvania (the "Project") and, relatedly,

disputes by the various contractors involved in that Project over entitlement to payment.

16.    In the lead action, the developer of the Project, Chestlen Development, LP

("Chestlen"), filed suit against the construction manager for the Project, Tutor Perini Building

Corp. ("TPBC"), styled *Chestlen Development, LP v. Tutor Perini Building Corp*., Philadelphia

Court of Common Pleas ("PCCP"), January Term, 2021, No. 00645 (the "*Chestlen* Lawsuit").  A

true and correct copy of the *Chestlen* Lawsuit Complaint is appended hereto at **Exhibit "A"**.

17.     In its complaint, Chestlen claims that TPBC's defective work and mismanagement of the Project caused it to incur remediation expense to correct deficient work during the course of construction, leading to delays in completion of the Project. *Id.* at ¶¶2-10.

18.     Chestlen alleges that it is entitled to liquidated damages for the continued delay in completion of the Project, as well as other consequential damages on account of TPBC's alleged breach of the construction management agreements and under tort theories of fraud, negligent misrepresentation, and conversion (which as noted *infra*, were subsequently dismissed). *Id.* at Counts I-IV.

19.     While the claims by Chestlen against TPBC include wide ranging complaints about defective and untimely work during the course of construction, all of those claims have one thing in common:  Any alleged damage to the Project occurred before the Project was completed.  This is self-evident from Chestlen's operative pleading which frames those claims for damages, and was filed <u>before</u> the Project was completed:

> Construction on the Project commenced in April 2015. Now, a half-decade later, TPBC **has still not completed the Project** due to its own wrongful conduct which has directly resulted in more than a two-and-a-half year delay in opening. … Indeed, what began as a Project with a promised Substantial Completion Date in August 2018 and a Guaranteed Maximum Price ("GMP") set by the initial contracts at $239,161,272, **has devolved into a Project that remained unfinished years past the Substantial Completion date (and remains unfinished now)** and for which TPBC has refused to take responsibility to finish within the GMP.

*Id.* at ¶2 (emphasis supplied).

20.     On April 5, 2021, TPBC filed a complaint against Chestlen styled *Tutor Perini Building Corp. v. Chestlen Development, LP*, PCCP December Term, 2020, No. 00207 (the "*Tutor Perini* Lawsuit"), and on May 14, 2021 a "Joinder Complaint" against two of TPBC's subcontractors on the Project: (1) the concrete subcontractor, Carney, and (2) the window wall subcontractor, Ventana DBS, LLC ("Ventana"), and their respective sureties (the "Joinder

Complaint"). A true and correct copy of the *Tutor Perini* Lawsuit Complaint and the Joinder Complaint are appended hereto at **Exhibit "B"** and **Exhibit "C"**, respectively.

21.     In the *Tutor Perini* Lawsuit against Chestlen, TPBC seeks to recover unpaid sums for construction costs incurred for construction of the Project. See *Tutor Perini* Lawsuit Complaint at ¶¶1-4.

22.     In the Joinder Complaint, TPBC advances derivative liability claims against Carney and Ventana on Chestlen's principal claims, asserting these subcontractors (or their sureties) are liable over to TPBC on Chestlen's claims, if proven, on account of deficiencies and delays in performing their subcontracted work during the course of construction of the Project (the "Derivative Claims"). See Joinder Complaint at Counts I and II.

23.     The *Chestlen* Lawsuit and the *Tutor Perini* Lawsuit (inclusive of the Joinder Complaint) were consolidated under the lead *Chestlen* Lawsuit on May 25, 2021, and those actions were subsequently consolidated with the civil action brought against Chestlen's design professionals, and over 25 other lawsuits brought by various subcontractors who have asserted mechanics liens for their work on the Project.

24.     The lead Chestlen Lawsuit, which advances the Project related claims against TPBC which are, in turn, the subject of TPBC's Derivative Claims against Carney, alleges:

> 3.     TPBC' s defective work and mismanagement plagued this Project from the start. TPBC hired an inexperienced concrete subcontractor, Thomas P. Carney, Inc. ("Carney"), which rushed the removal of forms after pouring the concrete for each floor. Among other things, Carney only supplied two floors of "tables" (movable supports for reinforced concrete floors while curing) which is less than should have been provided, resulting in a time crunch to remove supports and get tables ready for another pour. In addition, TPBC and Carney prematurely removed shores without timely placing reshores thus allowing "green" concrete to deflect under its own weight. Other problems included incorrectly setting elevation of the forms, and not securing the form jacks prior to the pour resulting in unevenly settled concrete. TPBC' s actions failed to comply with the Project Specifications and the designs and procedures of the Project' s engineers, as well as falling woefully short of basic industry standards. The result of this deficient work left the concrete insufficient time to cure causing uneven, unlevel, wavy, curved, and, ultimately, defective floors.

Rather than admit these problems head on, TPBC instead took affirmative steps to conceal them.  Without notice to Chestlen, TPBC, among other things, improperly grinded the slab edges to avoid detection that there were material defects.

4. The defective concrete floors and ceilings led to significant delays in installing the windows, as the floors were not at the correct heights for window installation. This further resulted in the interior being exposed longer than anticipated and delayed the ability to begin finishing the interior of the building. The wavy, uneven and unlevel floors resulted in difficulties installing finishes, cabinetry, flooring, and otherwise completing the guest rooms.

5. Despite many opportunities, at no point did TPBC acknowledge these obvious problems, or, as it should have, work with Chestlen to devise a remediation plan. Instead, TPBC purposefully attempted to conceal its errors and the resultant problems. This prevented Chestlen from timely identifying the problems caused by TPBC' s failures, which continually compounded those errors and forced Chestlen to directly hire its own contractors to remediate the floors. Chestlen was forced to hire contractors directly because TPBC abdicated its responsibility for providing what it was contracted to provide. Because TPBC was not upfront and honest at the outset, which as a Construction Manager (and otherwise) it was obligated to do, the problems were not fully addressed and remediated before they caused additional problems. TPBC' s failure to do so has caused Chestlen to suffer tens of millions of dollars in damages, and delayed the opening of the Project by over two and a half years.

*Chestlen* Lawsuit Complaint at ¶¶3-5.

25.    In more specific regards, Chestlen alleges that Carney failed to comply with "Collins Shoring/Reshoring Plan" specifications for the shoring and reshoring of the concrete floors as each floor was poured, *id.* at ¶40, which led to systemic problems with other aspects of the ongoing construction, extensive remedial work, and delays in the completion of the Project:

41. As early as December 9, 2016, the Architect, CLA, expressed to TPBC its concerns with the deficient concrete construction as follows: "we did not expect to have rebar or stirrups being cut in the field or have non-conforming rebar; we also did not expect major voids in the concrete after the forms were removed, or to have concrete pours being terminated in areas that were not as approved. The concrete work is the foundation of this building. If this isn't built correctly, additional problems in the future are guaranteed."

42. Further to this point, TPBC was notified as the floors were being constructed that, as commonly referenced in the industry and in the Agreements, floor flatness and levelness ("FF/FL") measures were faulty. Per the testing agency engineer, Pennoni Associates, Inc., such FF/FL measurement results are used as a method for the contractor to improve their finishing means and methods as the concrete pours progress. However, despite the notification of these faulty results, TPBC continued to employ its faulty methods and continued to ignore the requirements of the Structural

Engineer and Architect. As a result, no improvement in the FF/FL values were noted as the work progressed, leading to additional problems as the Project construction continued.

43. On or about June 19, 2017, VSM expressed to TPBC its concerns with TPBC's and Carney's deficient work and quality control referencing unresolved issues from as early as March 2017.

44. On or about September 28, 2017, Jerret Click of VSM again expressed to Patrick Bolger of TPBC concerns with Carney's work. TPBC pushed back and recommended "as [Owner's] Construction Manager" that Carney be paid even though the work was deficient. VSM again responded noting that the deficient work by Carney had created problems for the precast and window wall, affecting other subcontractors' work. Yet again, TPBC refused to acknowledge any wrongdoing by Carney.

45. On or about December 13, 2017, Terry Meistering of VSM, expressed to TPBC in a letter that Chestlen had concerns about the quality of the concrete work TPBC had completed to that point on floors 10 through 19.

46. VSM explained in that December 13, 2017, letter that Chestlen was concerned about the concrete slab edges on floors 10 through 19 because "[a]s placed, the slabs on those floors did not meet the contractual specifications for concrete floors or the window wall fabricator's requirements for existing conditions to accept window wall panels." Accordingly, the work failed to satisfy contractual requirements. See Exhibit A, ¶¶ 4.4.5 (requiring the work to be performed "in a neat, good and workmanlike manner, free of defects, and in accordance with sound construction practices.") and 4.5.1 (TPBC's warranty and standard of care).

47. Rather than work with Chestlen to fix the slab deflections, TPBC opted to compound its error, and in a series of further communications with VSM and Chestlen, misrepresented that TPBC had "corrected the problems." With no notice to Chestlen or the Structural Engineer on the Project, TPBC commenced cutting and grinding concrete and rebar. TPBC claims that the cutting and grinding was necessary to mitigate the problem that it had created.

48. As VSM explained in its December 13, 2017 letter to TPBC: "The Owner has observed that TPBC's subcontractor, T.P. Carney (Carney), has been making extensive remedial revisions to the installed concrete slabs, including grinding, hammering, and chipping both top and bottom surfaces at the slab edges. No design team input was sought or obtained before this work began. The extent of concrete removal itself is creating concerns which have yet to be addressed." VSM further stated, "None of the foregoing should be new or surprising to TPBC, as it has already been brought to TPBC's attention repeatedly." These concerns had been brought to TPBC's attention repeatedly since at least December 2016.

49. VSM detailed the specific observations of TPBC's significant unauthorized alterations to structural components of the building, as follows:

   a) Locations where greater than 1.5 inches of concrete were removed from the underside of the concrete slab;
   b) Concrete removal that exposed a large quantity of rebar;

9

    c)  Exposed rebar still mostly encased in concrete showing signs of damage from hand tools and grinders;

    d)  Rebar that was cut off and discarded; and

    e)  Prior to concrete placement, rebar was cut at the slab edge to prevent conflicts with future window anchor bolts.

50. Once the Structural Engineer provided direction giving acceptable parameters for grinding, TPBC continued to intentionally conceal exceeding those guidelines and then commenced what TPBC called "repair" work without approval of the procedure or notification of the work taking place.

51. Despite VSM's instruction that "the cost and schedule impact of remediation of defective or negligently performed work is for TPBC' s account," TPBC improperly billed Chestlen for Carney's work grinding and chipping the slabs that Carney and TPBC caused to deflect in the first place, knowing that TPBC and Carney were 100% responsible for these errors.

52. VSM noted that Chestlen "ha[d] been requesting detailed updates for some time but has not received responses." In addition, the concerns in VSM's letter were raised previously and repeatedly brought to TPBC's attention in at least the following instances:

    a)  On or about November 9, 2017, members of VSM, TPBC, CLA, O&N met to discuss slab deflection results for level 24 and slab edge revisions required for window installation. At this meeting, TPBC was asked to answer questions about its efforts to grind the concrete to remedy its faulty work. TPBC was also asked to provide test and survey results concerning the slab edge. At the time of VSM's letter, TPBC had failed to respond to these questions and failed to provide test and survey results.

    b)  In a November 7, 2017, VSM letter to TPBC, as well as in VSM's response to TPBC's October 2017 schedule narrative dated November 16, 2017, VSM explicitly stated that the added tasks associated with the slab edge revisions needed to be assessed for schedule impact and that such tasks should be included in the next schedule update. Despite this directive, the next schedule update on December 6, 2017 failed (as part of TPBC's deception campaign) to include added tasks for slab edge revisions. VSM explained that slab edge revision tasks were negatively affecting the schedule for window installation because not only were the scheduled activities not starting on time, but they were taking far longer than expected and exceeding their planned durations.

    c)  On or about November 29, 2017, members of VSM, TPBC, CLA, The Façade Group (TFG) and Ventana met onsite to discuss building enclosure activities. At that meeting, TPBC was asked to obtain a letter from Dow Corning confirming the validity of its warranty given the defective conditions of the Project created by TPBC. TPBC had not provided such confirmation at the time of VSM's letter. In addition, Ventana was asked to confirm its use of excessive shims in engineered shop drawings because the total shim thickness in some areas was several inches due to the uneven slab edge heights. No confirmation was received at the time of VSM's letter. Chestlen is informed and believes that TPBC directed Ventana to not provide such confirmation to VSM, to further TPBC's efforts to

mislead Chestlen and its consultant, and to allow TPBC to continue to conceal its errors until it was too late for Chestlen to do anything about it.

53. VSM stressed to TPBC that problems associated with the slab edge deflection caused installation of the window wall enclosure system to be drastically behind schedule.

54. Despite these problems and TPBC's failure to cooperate in revising the slab edge, VSM emphasized its willingness to be involved in the process to ensure quality and performance on the Project. VSM also asked for TPBC to communicate more effectively and to address any past and future problems with urgency.

55. TPBC caused unnecessary window installation delay by failing to properly remediate issues with the concrete slab edge resulting from TPBC's lack of supervision and oversight of Carney's concrete pouring and framing, and failure to coordinate its subcontractors, in particular, Carney and Ventana.

56. At all times, TPBC knew about Carney's and its own errors regarding the floors, and nonetheless allowed Carney to repeatedly commit the very same errors as Carney continued to pour concrete floors.

*Chestlen* Lawsuit Complaint at ¶¶41-56.

26.     Chestlen goes on to allege specific impacts to the Project during construction under the caption "TPBC'S Defective Concrete Work and Other Defective Work Delayed The Substantial Completion of The Project and Caused Chestlen to Incur Damages", *Chestlen* Lawsuit Complaint at ¶¶94-117.

27.     In these regards, Chestlen alleges, *inter alia*, that the faulty concrete work is "impacting the installation of windows throughout the Project", *id.* at ¶108, and "causing major impacts on efficiency and the cost of fitting out the space; requiring that the finishing of each room be conducted on a room by room basis, with furnishings required to be individually shaped and sized to each specific room, negating uniform installation, and causing Chestlen to incur enormous mitigation and correction expenses …" *id.* at ¶¶95-98, and ¶¶99-105 (detailing the remedial measures undertaken during the course of construction of the Project to address these issues).

11

28.     Chestlen avers that "the cost of Chestlen's remediation effort exceeded $4,500,000, plus delays, additional financing costs, and the interest cost of the extra months of work, among other harm." *Id.* at ¶109.  It further avers that that the continued delays in the Project's completion amounted to at least $30,905,000 in liquidated damages (at $35,000 per day) as of the filing of the *Chestlen* complaint.  *Id.* at ¶178 ("The actual delay at this juncture entirely attributable to TPBC is 883 days, resulting in liquidated damages of $30,905,000 based on a scheduled substantial completion date of August 3, 2018, and 883 penalty days as of January 11, 2021 [the filing date].").

29.     For its Derivative Claims against Carney, TPBC refers to Chestlen's principal claims that Carney's work "was defective, deficient, and untimely," and adds to the list regarding ongoing problems with the construction as including at least 125 windows (also referred to as "vents") which "are broken and/or inoperable and that TPBC is responsible for repairing and/or replacing" as the construction progressed.  See Joinder Complaint at ¶¶31-34 and Exhibit "8" (As of March 19, 2021, "TPBC does not dispute that over 125 windows are broken and/or inoperable and that TPBC is responsible for repairing and/or replacing those windows.").

30.     On August 2, 2024, the Trial Court in the Lawsuit granted in part and denied in part TPBC's Motion for Partial Summary Judgment dismissing Chestlen's tort based claims, and limiting its principal claims to liquidated damages on account of the delays in the construction of the Project and consequential damages to the Project not waived under the operative construction management contracts.  A true and correct copy of the August 2, 2024 Order on TPBC's Motion for Partial Summary Judgment is appended hereto at **Exhibit "D"**.

31.     Further, as regards to the Derivative Claims by TPBC against Carney, the Trial Court found that the same center around the question of whether Carney's performance of the

concrete work on this project was substandard and caused such substantial defects to not only

delay the project but to also require substantial extra work and remediation to undo Carney's

errors, and thus implicated questions of fact as to *whether* Carney has legal liability for delays in

the project and deficiencies in the concrete work which required remediation during the course of

construction, not *when* those alleged damages occurred:

> This case centers around the question of whether Carney's performance of work
> on this project was substandard and caused such substantial defects to not only
> delay the project but to also require substantial extra work and remediation to
> undo Carney's errors. The court is unimpressed with Carney's narrow view of the
> evidence and disagrees that Tutor Perini is limited to offering only evidence that
> it, itself, obtained in discovery. The consolidation of these cases means that
> evidence across all the cases and obtained by any party can be considered, and has
> been considered by the court, leading to the inescapable conclusion that Carney
> has not demonstrated the requisites for a dismissal of Tutor Perini's claims. There
> are more than sufficient facts in the record and/or inferences to be drawn from the
> available facts preventing the court from concluding that Carney has no
> responsibility for delays in the project or deficiencies in the concrete work. The
> extent to which Carney should be held liable involves weighing the evidence and
> determining credibility, which are matters that cannot be resolved by way of
> summary judgment.

A true and correct copy of the September 4, 2024 Order on Carney's Motion for Summary

Judgment is appended hereto at **Exhibit "E"**.

32.    The Trial Court also found that questions of fact regarding *whether* Ventana's

design and installation of the window wall systems at the Project were causal to the delays and

window failures during the Project's construction so as to preclude summary judgment in its

favor.  A true and correct copy of the September 4, 2024 Order on Ventana's Motion for Partial

Summary Judgment is appended hereto at **Exhibit "F"**.

**B.    The Zurich CCIP Policies**

33.    ZAIC issued Contractor Controlled Insurance Program Policy No. GLO 5819877-

00 (the "Primary CCIP Policy") to Tutor Perini Corporation at its headquarters and principal

place of business at 15901 Olden St., Sylmar, CA 91342-1051.  A true, correct, and certified copy of the Primary CCIP Policy is appended hereto at **Exhibit "G."**

34.     The Primary CCIP Policy was produced by Alliant Insurance Services, Inc., 333 S. Hope St., Ste 3750, Los Angeles, CA 90071-3047.  *Id.* at Common Policy Declarations.

35.     The Primary CCIP Policy affords certain commercial general liability coverage limited to "Designated Projects", with a per occurrence limit of $2 Million, subject to a $1 Million deductible, with "allocated loss adjustment expense" (defense costs) paid by the insured and eroding that deductible.  *Id.* at Commercial General Liability Coverage Part Declarations, and Combined Aggregate Deductible Endorsement (U-GL-1336-B CW (10/ 2007)).

36.     The Project is identified as a "Designated Project" under the Primary CCIP Policy.  The project duration is scheduled from March 31, 2015 through February 28, 2021.  See CCIP Primary Policy at Policy Change Endorsement 36.  For context, the *Chestlen* Lawsuit Complaint was filed on January 11, 2021.

37.     TPBC is scheduled as an additional Named Insured under the Primary CCIP Policy.  CCIP Primary Policy at Policy Change Endorsement 16.

38.     Who is an "insured", for purposes of the commercial general liability insurance under the Primary CCIP Policy, is amended to include Carney and Ventana as enrolled contractors for the Project.  *Id.* at Named Insured — Contractor Controlled Insurance Program Endorsement (U-GL-1380-A CW (03/09)).

39.     Tutor Perini Corporation is the "sole agent" for all qualifying insureds under the Primary CCIP Policy, and authorized to act on their behalf:

SOLE AGENT FOR INSUREDS

THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

IT IS AGREED THAT THIS POLICY IS ISSUED AT THE DIRECTION OF THE
FIRST NAMED INSURED, WHICH SHALL BE SOLELY RESPONSIBLE FOR THE
PAYMENT OF PREMIUMS AND LOSSES UNDER THE DEDUCTIBLE AMOUNT
AS OUTLINED IN THE POLICY AND SHALL HAVE OTHER POLICY RIGHTS TO
ACT ON BEHALF OF INSUREDS. THE INSUREDS HAVE ASSIGNED TO THE
FIRST NAMED INSURED:

1.  THE RIGHTS, TITLE, AND INTEREST TO RECEIVE ANY AND ALL RETURN
    OF PREMIUM, DIVIDENDS, DISCOUNTS OR OTHER ADJUSTMENTS; AND

2.  THE RIGHT TO REQUEST CANCELLATION OF THE POLICY; AND

3.  AUTHORIZATION TO ACT ON THEIR BEHALF AS RESPECTS CHANGES TO
    ANY PROVISIONS OF THIS INSURANCE POLICY.

WE CONSENT TO SUCH ASSIGNMENT OF RIGHTS, TITLE AND INTEREST.

OTHER TERMS ALL OTHER TERMS AND CONDITIONS OF THE POLICY NOT
CHANGED BY THE PROVISIONS OF THIS ENDORSEMENT CONTINUE TO
APPLY AS CURRENTLY WRITTEN.

Primary CCIP Policy at Sole Agent For Insureds Endorsement (U-GL-1114-A CW (10/02)).

40.     Relevant to the instant matter, the Coverage A insuring agreement in the Primary

CCIP Policy provides occurrence based commercial general liability coverage for third party

claims for "property damage" and reads, in relevant part, as follows:

Coverage A. Bodily Injury And Property Damage Liability

Insuring Agreement

a.  We will pay those sums that the insured becomes legally obligated to pay as damages
    because of "bodily injury" or "property damage" to which this insurance applies. We
    will have the right and duty to defend the insured against any "suit" seeking those
    damages. However, we will have no duty to defend the insured against any "suit"
    seeking damages for "bodily injury" or "property damage" to which this insurance
    does not apply. …

Primary CCIP Policy at Commercial General Liability Coverage form (CG 0001 (12/07)),

Section I.A.[1]

---

[1] Under this insuring agreement, damages because of "property damage" include damages the insured
becomes legally obligated to pay because of "property damage" to "your work" or caused by "your
work", and the same is deemed to be caused by an "occurrence" regardless of whether the "property

41.      "Property damage" within the scope of this insuring agreement is defined as:

"Property damage" means:

Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

*Id.* at Commercial General Liability Coverage form (CG 0001 (12/07)), Section V. Definitions, ¶17.

42.      The Primary CCIP Policy does <u>not</u> cover claims for "property damage" to any part of any "designated project(s)", including materials, machinery and equipment intended to become a part of the project, where such "property damage" occurs during the course of construction:

This insurance does not apply to:

j.    Damage to Property

"Property damage" to:
…
(5)  **Any part of any "designated project(s)", including materials, machinery and equipment intended to become a part of the "designated project(s)", if such "property damage" occurs during the course of construction**;
…

*Id.* at Section I.A., ¶2 (Exclusions), Item j. *as amended by* the Damage to the Project Exclusion Endorsement (U-GL-1301-B-CW (4/11)).

---

damage" arises from breach of contract.  However, with regard to "property damage" to "your work" within the "products-completed operations hazard", such "property damage" is only deemed to be an "occurrence" if  the "property damage" concerns work performed by a subcontractor or is the result of work performed by a subcontractor.  *Id. as amended by* the Resulting Damage To Your Work - Wrap-Up Endorsement (U-GL-1114-A CW (10/02)).

43.    The commercial general liability coverage afforded under the Primary CCIP

Policy is also subject to, *inter alia*, additional exclusions including the "Expected Or Intended

Injury Exclusion", "Contractual Liability Exclusion" and the "j.1 Exclusion", and certain

business risk exclusions including the "j.6 Exclusion", the "Your Product Exclusion", the "Your

Work Exclusion", and the "Impaired Property Exclusion":

2.    Exclusions

This insurance does not apply to:

a.    Expected Or Intended Injury ["Expected Or Intended Injury Exclusion"]

    "Bodily injury" or "property damage" expected or intended from the standpoint of
the insured.  This exclusion does not apply to "bodily injury" resulting from the use
of reasonable force to protect persons or property.

b.    Contractual Liability [the "Contractual Liability Exclusion"]

    "Bodily injury" or "property damage" for which the insured is obligated to pay
damages by reason of the assumption of liability in a contract or agreement. This
exclusion does not apply to liability for damages:

    (1)  That the insured would have in the absence of the contract or agreement; or
    (2)  Assumed in a contract or agreement that is an "insured contract", provided the
"bodily injury" or "property damage" occurs subsequent to the execution of the
contract or agreement. . .

…

j.    Damage to Property [the "j.1 Exclusion" and "j.6 Exclusion"]

    "Property damage" to:

    (1)  Property you own, rent, or occupy, including any costs or expenses incurred by
you, or any other person, organization or entity, for repair, replacement,
enhancement, restoration or maintenance of such property for any reason,
including prevention of injury to a person or damage to another's property;

    (6)  That particular part of any property that must be restored, repaired or replaced
because "your work" was incorrectly performed on it.[2]

…

---

[2] The j.6 Exclusion does not apply to "property damage" included in the "products-completed
operations hazard".  That hazard, however, is not implicated by the Lawsuit because the work on
the project was not completed at the time suit was filed nor was any part of the work at this
project, if completed, put to its intended use by any person or organization other than another
contractor or subcontractor working on the same project.

    k.   Damage To Your Product [the "Your Product Exclusion"]

        "Property damage" to "your product" arising out of it or any part of it.

    l.   Damage To Your Work [the "Your Work Exclusion"]

        "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard". This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

    m.  Damage To Impaired Property
        Or Property Not Physically Injured [the "Impaired Property Exclusion"]

        "Property damage" to "impaired property" or property that has not been physically injured, arising out of:

        (1)  A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

        (2)  A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

        This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

*Id.* at Commercial General Liability Coverage form (CG 0001 (12/07)), Section I.A., ¶2

(Exclusions).

       44.    As relevant to these coverage exclusions, "your work" is defined as:

"Your work":

(a)  Means:

      (1)  Work or operations performed by you or on your behalf; and
      (2)  Materials, parts or equipment furnished in connection with such work or operations.

(b)  Includes:

      (1)  Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and
      (2)  The providing of or failure to provide warnings or instructions.

Primary CCIP Policy at Commercial General Liability Coverage Form (CG 0001 (12/07)),

Section V., Definitions, ¶22.

45.     For purposes of that portion of Impaired Property Exclusion which applies to

"impaired property", the phrase "impaired property" is defined as:

> "Impaired property" means tangible property, other than "your product" or "your work",
> that cannot be used or is less useful because:
>
> a.  It incorporates "your product" or "your work" that is known or thought to be
>     defective, deficient, inadequate or dangerous; or
> b.  You have failed to fulfill the terms of a contract or agreement;
>
> if such property can be restored to use by the repair, replacement, adjustment or removal
> of "your product" or "your work" or your fulfilling the terms of the contract or
> agreement.

*Id*. at Section V., Definitions, ¶8.

46.     AGLIC issued Straight Excess Liability Policy No. SXS 5819649-00 (the "Excess

CCIP Policy") to Tutor Perini Corporation at its headquarters and principal place of business in

Sylmar, CA.  A true, correct, and certified copy of the Excess CCIP Policy is appended hereto at

**Exhibit "H".**

47.     The Excess CCIP Policy was produced by Alliant Insurance Services, Inc., 333 S.

Hope St., Ste 3750, Los Angeles, CA 90071-3047.  *Id.* at Straight Excess Liability Policy

Declarations.

48.     The Excess CCIP Policy provides follow form excess indemnity coverage with a

limit of $25,000,000 over the scheduled underlying Primary CCIP Policy (i.e., the **underlying**

**insurance**).[3]  *Id.* at Straight Excess Liability Policy Coverage Form U-SXS-100-A CW (09/11),

Section I., and Schedule of Underlying Insurance, Item A.

---

[3] Terms referenced in **bold** in the Excess CCIP Policy are defined in the coverage forms comprising the
policy.

49.     The follow form excess coverage applies only to the extent underlying terms and conditions of the Primary CCIP Policy are not inconsistent with or do not conflict with the terms and conditions of the Excess CCIP Policy:

Insuring Agreements

SECTION I. COVERAGE

A.  We will pay on behalf of the insured those damages covered by this insurance in excess of the total Applicable Limits of **underlying insurance**. This policy includes:

1. The terms and conditions of **underlying insurance** to the extent such terms and conditions are not inconsistent or do not conflict with the terms and conditions referred to in Paragraph 2. below; and

2. The terms and conditions that apply to this policy.

B.  Notwithstanding anything to the contrary contained in Paragraph A. above, if **underlying insurance** does not apply to damages for reasons other than exhaustion of total applicable limits of insurance by payment of **loss**, then this policy does not apply to such damages.

*Id.*

50.     TPBC, Carney, and Ventana each qualify as an "insured" under the Excess CCIP Policy to the same extent each of them qualifies as an "insured" under the Primary CCIP Policy. *Id.* at Preamble ("The word 'insured(s)' means any person or organization qualifying as such in **underlying insurance** but only to the extent and within the scope for which such 'insured(s)' qualify for coverage in **underlying insurance**.").

51.     Beyond the limitations and exclusions to coverage under the followed Primary CCIP Policy, the Excess CCIP Policy also includes a "Damage to the Project Exclusion", which similarly precludes coverage for claims for "property damage" to any part of any "designated project(s)", including materials, machinery and equipment intended to become a part of the "designated project(s)", when such "property damage" occurs during the course of construction:

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

20

This policy does not apply to any liability, damage, loss, cost or expense arising out of property damage to:

1.  Any part of the construction project(s) at the location(s) described in the Schedule of this endorsement, including materials, machinery and equipment to become a part of the construction project(s) at the described location(s), while that(those) project(s) is (are) under the course of construction; or

2.  Any equipment or machinery owned, borrowed or leased by any insured for which any insured has assumed responsibility by written or oral agreement.

This exclusion does not apply to any liability, damage, loss, cost or expense arising out of property damage included in the products/completed operations hazard.

Excess Policy at Property Damage To The Project Exclusion (U-EXS-419-A CW (3/12)).

52.    The Primary CCIP Policy and the Excess CCIP Policy are collectively referred to as the "Zurich CCIP Policies".

53.    The Damage to the Project Exclusion in the Primary CCIP Policy and the Property Damage To The Project Exclusion in the Excess CCIP Policy are collectively referred to as the "COCE".

## C.    ZURICH RESERVES ALL RIGHTS UNDER THE ZURICH CCIP POLICIES

54.    On January 28, 2021, Tutor Perini Corporation placed Zurich on notice of the *Chestlen* Lawsuit against TPBC.[4]

55.    On August 16, 2021, Zurich advised TPBC that ZAIC and AGLIC "do not believe the Chestlen Litigation gives rise to a duty to defend or implicates an indemnity obligation under the [Zurich] Policies," but agreed to indemnify TPBC for certain defense costs, at certain specified rates, by TPBC's previously selected defense counsel, subject to a full reservation of rights.  A true and correct copy of Zurich's August 16, 2021 correspondence is appended hereto at **Exhibit "I"**.

---

[4] Notice to Zurich of the *Chestlen* Lawsuit (filed on January 11, 2021) followed TPBC's prior commencement of the *Tutor Perini* Lawsuit by Writ on December 8, 2020.

56.     Zurich explained, *inter alia*, that the damage claims in the *Chestlen* Lawsuit may not implicate covered "property damage" (as opposed to purely economic losses), or may otherwise be excluded by the COCE, the contractual liability exclusion, the j.1 Exclusion, and the business risk exclusions, inclusive of the j.6 Exclusion, the Your Product Exclusion, the Your Work Exclusion, and the Impaired Property Exclusion.

57.     Among other rights reserved, Zurich expressly reserved the right to disclaim any defense or indemnity obligation under the Zurich CCIP Policies relative to the Lawsuit, to withdraw from the defense on the grounds there is no potential for covered liability or damages under the Zurich CCIP Policies, to recoup any amounts paid as defense expenses, and to pursue declaratory relief relative to any claimed defense or indemnity obligation under the Zurich CCIP Policies relative to the claims in the Lawsuit. *Id.*

58.     Tutor Perini did not respond to Zurich's reservation of rights correspondence or challenge the coverage positions advanced or the hourly rates Zurich set for defense costs advanced under reservation.

59.     Carney did not tender its defense of the Joinder Complaint for consideration of coverage under the Zurich CCIP Policies until March 3, 2023, nearly two (2) years after the Joinder Complaint was filed.

60.     Zurich acknowledged Carney's tender on March 29, 2023, reserved rights under the Zurich CCIP Policies, and requested further information from Carney.  A true and correct copy of Zurich's March 29, 2023 correspondence is appended hereto at **Exhibit "J"**.

61.     On June 19, 2023, Zurich advised Carney that ZAIC and AGLIC "do not believe the Chestlen Litigation gives rise to a duty to defend or implicates an indemnity obligation under the [Zurich] Policies," but agreed to indemnify Carney for certain defense costs, at certain

22

specified rates, by Carney's previously selected defense counsel, subject to a full reservation of rights. A true and correct copy of Zurich's June 19, 2023 correspondence is appended hereto at **Exhibit "K"**.

62.    Zurich explained, *inter alia*, that the damage claims in the Lawsuit may not implicate covered "property damage" (as opposed to purely economic losses), or may otherwise be excluded by the COCE, the contractual liability exclusion, and the business risk exclusions, inclusive of the j.6 Exclusion, the Your Product Exclusion, the Your Work Exclusion, and the Impaired Property Exclusion.

63.    Among other rights reserved, Zurich expressly reserved the right to disclaim any defense or indemnity obligation under the Zurich CCIP Policies relative to the Lawsuit, to withdraw from the defense on the grounds there is no potential for covered liability or damages under the Zurich CCIP Policies, to recoup any amounts paid as defense expenses, and to pursue declaratory relief relative to any claimed defense or indemnity obligation under the Zurich CCIP Policies relative to the claims in the Lawsuit. *Id.*

**D.    THE UNITED STATES DISTRICT COURT DECLARES THAT THE ZURICH CCIP POLICIES DO NOT AFFORD A DEFENSE OR INDEMNITY FOR THE CLAIMS IN THE LAWSUIT**

64.    On December 30, 2024, Tutor Perini filed a civil action for "declaratory relief" and "breach of contract" against Zurich in the United States District Court for the Central District of California styled, *Tutor Perini Corporation and Tutor Perini Building Corporation v. American Guarantee & Liability Insurance Company and Zurich American Insurance Company*, U.S.D.C. C.D. CA, No. 2:24-cv-11215 (the "Coverage Action"). A true and correct copy of the Complaint filed in the Coverage Action is appended hereto at **Exhibit "L"**.

65.    In the Coverage Action, Tutor Perini, as the lead Named Insureds under the Zurich CCIP Policies, sought declaratory relief, requesting the following rights under the Zurich

CCIP Policies be declared: (1) that the Zurich Defendants owe a duty to defend Tutor Perini in the Lawsuit, (2) that the Zurich Defendants owe a duty to indemnify Tutor Perini against the Lawsuit, (3) that no coverage exclusions or limitations apply to the claims or damages in the Lawsuit, and (4) that Tutor Perini is entitled to payment of defense costs and potential damages awarded in the Lawsuit.  *Id* at *ad damnum* clause.

66.     In the Coverage Action, Tutor Perini maintained that the Zurich CCIP Policies it purchased (and for which it serves as the "sole agent" for all qualifying enrolled contractors) are governed by California law.  *Id*.

67.     On March 20 and 21, 2025, ZAIC and AGLIC each filed an Answer, asserting affirmative defenses, and counterclaims for: (1) declaratory relief that the Zurich Defendants have no duty to defend Tutor Perini in the Lawsuit; (2) declaratory relief that the Zurich Defendants have no duty to indemnify Tutor Perini against the Lawsuit; and (3) reimbursement from Tutor Perini for defense expenses Zurich has advanced under reservation relative to TPBC's defense in the Lawsuit.  A true and correct copy of ZAIC's Answer, Affirmative Defenses, and Counterclaims and a true and correct copy of AGLIC's Answer, Affirmative Defenses, and Counterclaims in the Coverage Action are collectively appended hereto as **Exhibit "M"**.

68.     On November 18, 2025, the United States District Court for the Central District of California granted Zurich's Motion for Summary Judgment as to all the claims advanced by Tutor Perini in the Coverage Action and on Zurich's counterclaims for declaratory relief and reimbursement of defense fees and costs, declaring Zurich has no duty to defend or indemnify the claims advanced in the Lawsuit under the Zurich CCIP Policies.  A true and correct copy of the United States District Court for the Central District of California's Opinion and Order

("Op.") in the Coverage Action is appended hereto as **Exhibit "N"**, and fully incorporated herein by reference.

69.    On November 21, 2025 the United States District Court for the Central District of California entered a final judgment in favor of Zurich and against Tutor Perini in the Coverage Action and awarded reimbursement of the defense fees and costs incurred to defend TPBC in the Lawsuit in the amount of $2,919,008.54.  A true and correct copy of the final judgment in the Coverage Action is appended hereto as **Exhibit "O"**, and fully incorporated herein by reference.

70.    In reaching its decision that the Zurich CCIP Policies do not afford a defense or indemnity for the claims advanced in the Lawsuit, the United States District Court for the Central District of California held that the COCE precludes any insuring obligation relative to the damages claimed in the Lawsuit because those damages were alleged (and in fact) occurred during the course of construction of the Project.  *Id.*

71.    In support of that conclusion, the United States District Court for the Central District of California reasoned that "during the course of construction" as explicitly referenced in the COCE means that the Zurich CCIP Policies exclude coverage for all "property damage" that occurred during construction before the Project was complete:

> After considering these cases and reading the exclusion as a whole, the Court finds that the COCE precludes coverage for property damage to the Project if the property damage occurred during the Project's construction as whole, either simultaneously as or flowing from the construction. Thus, the exclusion covers the damages at issue in the Underlying Action. Chestlen's claims center on issues with the concrete floors. There is no dispute that the concrete issues arose while the Concrete Subcontractor [Carney] was working on construction of the concrete floors. From July 2016 to August 2018, the Concrete Subcontractor [Carney] actively worked on the concrete floors, and the concrete issues arose at least by December 2016, if not earlier. Moreover, the complaint in the Underlying Action framed the window issues as having been caused by the concrete floor issues, further indicating that any damages due to the window issues actually flowed from the concrete floor work.

Op. at 9.

72.     The United States District Court for the Central District of California specifically rejected Tutor Perini's argument that "there is no completion requirement in the COCE, and rather 'during the course of construction' means during active construction on the damaged part", holding instead that "the COCE is written to apply to property damage to any part of the Project during the course of construction as a whole."  *Id.*

73.     The United States District Court for the Central District of California specifically rejected Tutor Perini's argument that the products completed operations hazard definition should control when a subcontractor's work is "completed" for purposes of the COCE, holding instead that "[s]ince the COCE specifically excludes damages that occur 'during the course of construction,' and not during 'your work,' the Court cannot rewrite the Primary Policy to add meaning that is not present."  *Id.*

74.     The United States District Court for the Central District of California specifically rejected Tutor Perini's argument that the COCE was limited to the "property damage" to the areas where Carney was actively working, holding instead that "the COCE does not require the property damage to occur simultaneously as active construction but rather must at least flow from that construction and occur during the course of construction of the Project."  Hence, the District Court reasoned that "[s]ince the concrete issues arose from concrete construction and during the course of construction of the Project, including during the concrete floor construction period, the exclusion applies."  *Id.* at 9-10.

75.     The United States District Court for the Central District of California specifically rejected Tutor Perini's argument that disputed issues of fact remained as to whether Carney's work or faulty design caused the deflection in the concrete floors, explaining that "this dispute is

irrelevant to whether the COCE applies." *Id.* at 10 (emphasis added). The District Court held that "[t]he COCE does not include any requirement for the cause of the damage but rather applies depending on when the property damage occurred. Thus, any outstanding dispute on the cause of the damage is irrelevant because the damage is already excluded given it occurred during construction of the Project." *Id.* (emphasis added).

76.    The United States District Court for the Central District of California's declaratory judgment dispositively precludes any insuring obligation under the Zurich CCIP Policies for the claims in the Lawsuit.

77.    Because the Derivative Claims brought by TPBC against Carney are exclusively limited to the principal claims by Chestlen against TPBC—which are not covered under the Zurich CCIP Policies—there is no coverage under the Zurich CCIP Policies for the Derivative Claims by TPBC against Carney in the Joinder Complaint.

**E.    THE TRIAL COURT'S FINDINGS OF FACT IN THE LAWSUITS CONFIRMS THAT ANY "PROPERTY DAMAGE" AT ISSUE IN THE LAWSUIT OCCURRED DURING THE COURSE OF CONSTRUCTION OF THE PROJECT.**

78.    The Trial Court proceeded to try the liability phase of the Lawsuit over five months, with the parties presenting live testimony for a set period each month and additional testimony in the form of deposition designations and previously recorded expert testimony submitted separately. After the testimony and exhibits were submitted, the record for this portion of the trial was closed, and the parties subsequently submitted proposed findings of fact and conclusions of law. The parties also submitted their evidentiary objections, upon which the Court ruled and, based upon this record, entered its findings of fact and legal rulings. See October 28, 2025 Findings as to Liability and Order ("Order") and Findings of Fact and Conclusions of Law

("Findings"), a true and correct copy of which is appended hereto at **Exhibit "P"** and incorporated herein by reference.

79.     The Trial Court found that TPBC and Carney were each liable for the delays and remedial costs incurred during the course of construction of the Project, and absolved Ventana from any liability.  *Ibid.*

80.     The Trial Court observed that "the record largely shows [] a level of developed animosity and distrust between parties—the owner and its project manager (and its subcontractors)—that resulted in the construction manager in derogation of its duties to act in the best interests of the project engaging in a pervasive pattern of obfuscation, contentious posturing, deception, provoking its project subcontractor parties, and hiring 'experts' or consultants during the project to facilitate its effort to avoid fully and faithfully discharging its contractual duties and avoid 'act[ing] in the best interests of the project' which Tutor's principal fact witnesses understood to be and described as a 'fiduciary duty'."  Findings at 3-4.

81.     To be sure, the Trial Court found that all of the breaches by TPBC, relative to its construction management of the Project, and Carney, relative to its subcontracted concrete work, and the resultant delays and harm to the Project itself, <u>occurred while construction of the Project was underway and prior to its completion</u>:

> The testimony at trial and the communications described in testimony and in contemporaneous communications during the project demonstrated to the court that the contractor (Tutor), rather than assist or facilitate in efficient and faithful compliance with the specified tasks at hand, attain completion or fulfill its coordination responsibilities, engaged in a calculated effort to avoid blame at all costs and to point the finger for all contractual violations (large and small) on the universe of their perceived competitors and perceived adversary(s), contrary to an expeditious, competent professional completion of the project. These efforts also

> fostered such an unseemly high level of snark and enmity which consequently
> provoked intransigence in the parties as to make it nearly impossible to achieve
> any willingness or responsibility to solve problems, during the entire project.

*Id.* at 4.  See also, *id.* at ¶196 (No evidence was submitted at trial that the Project ever achieved

Substantial Completion as defined by the TPBC construction management contracts).

82.    Principal among the myriad of problems which the Trial Court found manifested

during the course of construction, was the defective concrete work by Carney which, among

other things, rendered the floors of the Project unlevel and subject to differential settlement,

delayed and impaired the installation of Ventana's windows system and caused damage to the

windows themselves as the construction progressed, and delayed and impaired installation (and

in some instances, reinstallation) of room finishes.

83.    As regards to Carney's defective work during the Project, the Trial Court found,

*inter alia*:

(a)    While Carney was pouring the concrete, Chestlen and its design team repeatedly raised concerns about Carney's quality control and schedule delays.  Findings at ¶84;

(b)    Carney was using improper means and methods during concrete installation; specifically, Carney was not following the Collins Shoring/Reshoring Plans because it was prematurely cracking concrete forms and cracking the wrong forms.  *Id.* at ¶119;

(c)    Carney continued to fail to follow the Collins Shoring/Reshoring Plans as it poured concrete slabs through the top of the Tower.  *Id.* at ¶124;

(d)    The floors exhibited "excessive deflections reported in the field" due to "improper reshoring activity", *id.* at ¶121, and based on "the real-time on-site observations" the issues with deflection and the failure to level the floors were replicated as the additional floors were poured.  *Id.* at ¶129; see also ¶111 (finding excessive deflections were occurring);

(e)    These defects resulted from poor concrete placement, screeding, strikeoff, and finishing of the floor slabs by Carney and were a significant contributor to the overall scope of required floor remediation.  *Id.* at ¶127;[5] and

(f)    The defects in the concrete were substantial and required remediation during construction of the Project.  *Id.* at ¶117.

---

[5] See also *id.* at ¶¶109 and 110 (finding Carney poured the concrete slabs for floors 11, 12, 13, and 14 to the wrong elevations resulting in the distance between the slabs on those floors being outside the tolerances accounted for in the specifications).

84.     The Trial Court found that Carney's defective work adversely impacted Ventana's window wall installation and damaged the operable window vents during the course of construction:

(a)     As of November 3, 2017, concrete quality control was impacting window wall installation. Findings at ¶120;

(b)     Since the installation of Ventana's window wall system was dependent upon the manner of attaching the system to concrete, Carney's failure to ensure the concrete pour met the specifications of the design, resulted in window failures during the project. *Id.* at ¶87;

(c)     The non-conforming concrete slabs required significant grinding and chipping at the slab edges, the use of impractical shims under the window wall anchors, and other unplanned, costly, and time-consuming measures to accommodate the installation of the window wall system, all of which resulting in significant delays to Ventana's installation work and costs. *Id.* at ¶95;

(d)     Carney repeatedly installed steel rebar into its concrete slabs in the very same places where Ventana had planned to drill its anchor holes; *Id.* at ¶228;

(e)     Throughout construction, Ventana encountered misplaced rebar in the concrete where its anchors were to be installed on "every slab" it worked on. *Id.* at ¶102;

(f)     Ventana's delays were not due to lack of manpower or the inability to procure materials in a timely manner, but rather due to improper and non-conforming site conditions caused by TPBC and Carney. *Id.* at ¶251;

(g)     The operable window vents had been manufactured properly and Ventana had made a good faith effort to correct operable vent issues by performing extensive adjustments and remediations; however, inspections during the course of construction showed that the operable vents were consistently out of square with the lower side of the window frame following deflection; vents that were once operating properly were later becoming out of square; and that the issues with the operable vents were due to differential settlement of the structure. *Id.* at ¶250;

(h)     As of March 2021, the Project had over one hundred inoperable window vents. *Id.* at ¶202; and

(i)     Prior to substantial completion of the Project, the Project still had inoperable window vents. *Id.* at ¶210;

85.     The Trial Court likewise found that Carney's defective work resulted in adverse impacts and delays during the fixture and finishes installations.  See e.g., Findings at ¶114 (As early as August 14, 2017 TPBC was advised that the concrete slabs had "two conditions that will affect the build-out of the floors; abrupt ridges/elevation changes and an overall rolling

(up/down) that will not allow for the proper setting of elevator sills, door bucks, resilient

flooring, base moldings, plumbing fixtures, counter tops, etc.").

86.     As a consequence, installation of finishes and fixtures was halted because

Chestlen "discovered deficiencies with the concrete floors" and  observed '[t]hat some cabinets

were out of level more than an inch and a half over 10 feet" and the "window frame to the floor

was very obviously not level."  Findings at ¶¶156-57; see also id. at ¶159 (finding uneven and

unlevel floors and cabinets that had to be "shimmed by what looked to be over 1-1/2" on one

side" and observing a round pen on the floor roll "downhill" due to the excessive deflections and

flatness/levelness issues with the concrete floors in early 2019).

87.     No evidence was submitted at trial that the Project ever achieved Substantial

Completion as defined by the TPBC construction management contracts. Findings at ¶196.

88.     Based on these and other detailed factual findings (which are incorporated herein

by reference for sake of brevity), the Trial Court found that "both [TPBC] and Carney are jointly

liable for the delays and for the additional costs to complete the [P]roject which do not arise out

of excusable delays within the meaning of the contract, with the percentage of liability to be

determined at the damages trial", and that the "overwhelming weight of the evidence at trial

established that the delays to Ventana's work were caused by the non-conforming, non-

coordinated and defective work by others, and were not due to any fault of Ventana." Id. at

Conclusion of Law, ¶¶30, 47.

## CASE AND CONTROVERSY

89.     Zurich maintains, as it has since the Carney tender of the Lawsuit was belatedly

advanced, that there is no coverage, inclusive of a defense or indemnity obligation, for the

Derivative Claims advanced against Carney in the Lawsuit under the Zurich CCIP Policies.

90.     Zurich maintains, as it has since the Carney tender of the Lawsuit was advanced, that it has the right to recover defense costs advanced on behalf of Carney in connection with Carney's defense under the Derivative Claims in the Lawsuit under prevailing California law.

91.     Despite the dispositive ruling by the United States District Court for the Central District of California's that there is no coverage available under the Zurich CCIP Policies relative to the Lawsuit, upon information and belief, Carney disputes Zurich's position that there is no coverage for the Derivative Claims advanced against Carney under the Zurich CCIP Policies.

92.     Despite the dispositive ruling by the United States District Court for the Central District of California's that Zurich is entitled to reimbursement of the defense costs advanced to defend the principal claims in the Lawsuit, upon information and belief, Carney disputes Zurich's right to recover the defense costs advanced on Carney's behalf to defend the Derivative Claims in the Lawsuit.

93.     An actual case and controversy has, accordingly, arisen with respect to the duties and obligations, if any, Zurich may have to defend or indemnify Carney in the Lawsuit under the Zurich CCIP Policies, as well as ZAIC's right to recover all defense costs and expenses it has advanced on behalf of Carney in connection with Carney's defense of the Derivative Claims in the Lawsuit.

**FIRST CAUSE OF ACTION**
**DECLARATORY RELIEF AGAINST CARNEY**
**(No Duty To Defend or Indemnify Under the Zurich CCIP Policies)**

94.     Zurich incorporates by reference each of the foregoing allegations of this Complaint as if the same were more fully set forth herein at length.

32

95.    For several independent reasons, Zurich has no duty to defend or indemnify Carney for the Derivative Claims advanced against Carney in the Lawsuit under the Zurich CCIP Policies.

96.    First, the dispositive declaratory judgment in the Coverage Action forecloses any claim by Carney that it is entitled to a defense or indemnity in the Lawsuit under the Zurich CCIP Policies.

97.    The question of coverage at issue in the Coverage Action is identical to that which could be contested by Carney in this action because the United States District Court for the Central District of California squarely and indisputably considered whether a defense or indemnity obligation arises under the Zurich CCIP Policies for the claims against TPBC in the *Chestlen* Lawsuit, and coverage for those same claims and policies are at issue in this action with respect to the Derivative Claims against Carney advanced by TPBC in the Joinder Complaint.

98.    Carney is in privity with Tutor Perini relative to any insuring obligation under the Zurich CCIP Policies.

99.    As applied to questions of preclusion, privity merely requires the sharing of an identity or community of interest, with adequate representation of that interest in the first suit, and circumstances such that the nonparty should reasonably have expected to be bound by the first suit.

100.    Carney's interests in securing coverage under the Zurich CCIP Policies relative to the claims in the Lawsuit are not merely similar to Tutor Perini's interest, but identical to Tutor Perini's interest such that Tutor Perini in fact (and given its rights as the policyholder and "sole agent" for other insureds enrolled in the CCIP under the Zurich CCIP Policies), acted as the virtual representative of Carney and any other qualifying enrolled contractor.

101.    Carney, upon information and belief, was on notice of the Coverage Action and elected not to intervene in that action or otherwise consent to *in personam* jurisdiction so as to enable its joinder by Tutor Perini at the time the Coverage Action was initiated.

102.    Tutor Perini had a full and fair opportunity to litigate whether the Lawsuit gives rise to a duty to defend or indemnify under the Zurich CCIP Policies and that coverage question was determined on the merits by way of a final judgment.

103.    Consequently, Carney is precluded as a matter of law from contending that Zurich has a duty to defend or indemnify Carney for the Derivative Claims advanced in the Lawsuit.

104.    Second, the COCE precludes a defense or indemnity obligation under the Zurich CCIP Policies for the Derivative Claims advanced against Carney for the reasons set forth by the United States District Court for the Central District of California in its opinion and judgment in the Coverage Action.

105.    Consequently, Zurich has no duty to defend or indemnify Carney for the Derivative Claims advanced in the Lawsuit.

106.    Third, the COCE precludes a defense or indemnity obligation under the Zurich CCIP Policies for the Derivative Claims advanced against Carney based on the Findings by the Trial Court in the Lawsuit which dispositively demonstrate that any claim for potentially covered "property damage", inclusive of Carney's liability for delay in the Project's completion (i.e., the liquidated damage claim), occurred during the course of construction of the Project.

107.    Consequently, Zurich has no duty to defend or indemnify Carney for the Derivative Claims advanced in the Lawsuit.

108.    Fourth, and irrespective of the declaration and judgment in the Coverage Action and the Findings by the Trial Court in the Lawsuit, as a threshold matter, coverage for Carney

could not possibly lie under the Zurich CCIP Policies because "property damage", if any, which may be the subject of the damage claims Chestlen advanced against TPBC in the *Chestlen* Lawsuit prior to the Project's completion (and which TPBC then derivatively advanced against Carney in the Joinder Complaint) necessarily occurred before the Project was completed.

109.    The *Chestlen* Lawsuit was filed before the Project was completed and, accordingly, addresses damages it claims it sustained, and thus occurred—whether implicating physical damage to property, loss of use of property not physically injured, or not—during the course of construction of the Project.

110.    In point of fact, the Zurich CCIP Policies expressly provide for a completion date of the Project for purposes of coverage on February 28, 2021, which is after the *Chestlen* Lawsuit was filed.

111.    Beyond that filing date establishing when any potentially covered "property damage" occurred, Chestlen makes the point perfectly clear in its pleading:

> Construction on the Project commenced in April 2015. Now, a half-decade later, TPBC **has still not completed the Project** due to its own wrongful conduct which has directly resulted in more than a two-and-a-half year delay in opening. … Indeed, what began as a Project with a promised Substantial Completion Date in August 2018 and a Guaranteed Maximum Price ("GMP") set by the initial contracts at $239,161,272, has devolved into **a Project that remained unfinished years past the Substantial Completion date (and remains unfinished now)** and for which TPBC has refused to take responsibility to finish within the GMP.

*Chestlen* Lawsuit Complaint at ¶2 (emphasis supplied).

112.    Chestlen's damage claims (and, consequently, the Derivative Claims against Carney) relative to Carney's work are limited to: (1) contractual liquidated delay damages on account of the Project not being completed; (2) defective concrete work which caused a delay in the completion of the Project and which had to be remediated during the course of construction and caused delays or misalignment of other work during the course of their construction; and (3)

a claim the building's windows were not timely installed (causing additional delay in Project completion) and, once they were, the operating vents would not articulate as specifically reported during the course of construction. All of these damage items involve occurrences that took place during the course of construction and prior to the Project's completion.

113.    The liquidated damage claim is based on the following contract provision:

> If the Construction Manager fails to attain Substantial Completion of the Work on or before the Required Substantial Completion Date, the Construction Manager shall be obligated to pay to the Owner upon demand, as liquidated damages and not a penalty, Thirty-Five Thousand Dollars ($35,000.00) for each day commencing on and including the tenth (10th) day after the Required Substantial Completion Date until Substantial Completion has occurred (including the date that Substantial Completion actually occurs.

*Chestlen* Lawsuit Complaint at ¶¶26, 178.

114.    Liquidated damages are not damages because of "property damage" within the coverage grant in the Zurich CCIP Policies but instead purport to represent costs imposed for failure to complete the Project on time. But even if one were to construe this contract claim as alleging damages because of a loss of use of property, the Zurich CCIP Policies make clear that a "loss of use shall be deemed to occur at the time of the 'occurrence' that caused it." Here, regardless of how one might characterize the cause of the delay, the delay itself clearly occurred during the course of construction. Indeed, the liquidated damage claim is dependent upon the delays *in the completion of the project.*

115.    Beyond the liquidated damage claim, the remaining claims which are the subject of the Derivative Claims against Carney, according to TPBC, involve consequential damages, subject to the Trial Court's summary judgment order rejecting the same as viable. Those consequential damage claims relate to allegations that Carney negligently performed its work in a manner that caused damage or delay to the ongoing work of others on the Project, and delayed the completion of the Project.

116.    Whether the concrete work was defective or not, and whether the cause of the variances in the concrete slabs was due to Carney's acts or omissions (as found by the Trial Court in its Findings) or some other cause, that work, and any alleged "property damage" which flowed from defective aspects of it, clearly occurred—and manifested—during the course of construction.

117.    There is simply no basis for Carney to contend the Zurich CCIP Policies apply to the Derivative Claims.  All of these claims are clearly excluded from coverage under the COCE.

118.    Consequently, Zurich has no duty to defend or indemnify Carney for the Derivative Claims advanced in the Lawsuit.

119.    Fifth, the Joinder Complaint does not implicate any claim for covered "property damage" as defined under the Zurich CCIP Policies and, alternatively, to the extent the Derivative Claims against Carney implicate covered "property damage", coverage, inclusive of any duty to defend or indemnify, is precluded by application of the Expected Or Intended Injury Exclusion, the Contractual Liability Exclusion, the j.1 Exclusion; the j.6 Exclusion, the Impaired Property Exclusion, the Your Product Exclusion, and/or the Your Work Exclusion under the Zurich CCIP Policies.

120.    Alternatively, there is no coverage available to Carney under the Zurich CCIP Policies, in whole or in part, for the following reasons:

(a) The Derivative Claims do not implicate a covered "occurrence" as defined by the Zurich CCIP Policies, not otherwise excluded;

(b) The Derivative Claims do not implicate covered "property damage" as defined by the Zurich CCIP Policies;

(c) Coverage under the Zurich CCIP Policies is barred to the extent any potentially covered "property damage" first manifested during the course of construction of the Project;

(d) Coverage under the Zurich CCIP Policies is barred to the extent any potentially covered "property damage" was expected by Carney, given, *inter alia*, its manifestation during the course of construction; first manifested during the course of construction of the Project;

(e) The Excess CCIP Policy does not implicate a duty to defend absent proper exhaustion of the limits of the Primary CCIP Policy which has not occurred, and the exhaustion of all other insurance, which has not occurred.

(f) Indemnity coverage under the Zurich CCIP Policies is limited to the applicable declared per occurrence limits under the Zurich CCIP Policies;

(g) Indemnity coverage under the Zurich CCIP Policies does not extend to any non-covered underlying claim or award of damages against Carney based upon any non-covered claim;

(h) Coverage, inclusive of any duty to defend or pay defense costs, under the Zurich CCIP Policies does not apply to the extent Carney failed to comply with the notice and reporting provisions of those policies;

(i) Coverage under the Zurich CCIP Policies does not apply to any pre-tender defense costs incurred by or on behalf of Carney;

(j) Coverage under the Zurich CCIP Policies does not apply to the extent Carney reached or reaches a settlement without Zurich's prior consent;

(k) Coverage under the Zurich CCIP Policies may not be available or is otherwise limited absent proper exhaustion of all other insurance;

(l) Coverage under the Zurich CCIP Policies may not be available or is otherwise limited to the extent any of the Derivative Claims are covered in whole or in part by any other insurance;

(m) Coverage, inclusive of any duty to defend or pay defense costs, under the Zurich CCIP Policies is subject to the satisfaction of any deductible and retention obligations; and

(n) Coverage under the Zurich CCIP Policies is otherwise barred or limited by application of the terms, limitations, conditions precedent, and exclusions to coverage, all of which are incorporated herein by reference.

121.    An actual controversy and a *bona fide* dispute over coverage exists between Zurich and Carney regarding Zurich's duties and obligations, if any, under the Zurich CCIP Policies with respect to the Derivative Claims advanced in the Lawsuit.

122.    For the reasons stated and which otherwise may be available at law or under the terms, limitations, conditions precedent, and exclusions to coverage of Zurich CCIP Policies, Zurich requests a judicial declaration that Zurich has no duty to defend or indemnify Carney in the Lawsuit under the Zurich CCIP Policies.

**WHEREFORE**, Zurich American Insurance Company and American Guarantee and Liability Insurance Company respectfully request that this Court declare that Zurich American Insurance Company and American Guarantee and Liability Insurance Company have no duty to defend or indemnify Thomas P. Carney, Inc. in the consolidated actions styled *Chestlen Development, LP v. Tutor Perini Building Corp*., Philadelphia Court of Common Pleas, January Term, 2021, No. 00645 and *Tutor Perini Building Corp. v. Chestlen Development, LP*, Philadelphia Court of Common Pleas, December Term, 2020, No. 00207 under Zurich American Insurance Company Contractor Controlled Insurance Program Policy No. GLO 5819877-00 or American Guarantee and Liability Insurance Company Straight Excess Liability Policy No. SXS 5819649-00.

## <u>SECOND CAUSE OF ACTION</u>
### RECOVERY OF DEFENSE COSTS

123.    Zurich incorporates by reference each of the foregoing allegations of this Complaint as if the same were more fully set forth herein at length.

124.    Under prevailing law, "[w]hen an insurer provides an insured a defense under a reservation of rights, and it is later determined that the claims were not covered and the duty to defend never arose, the insurer is entitled to reimbursement for costs advanced." Op. at 10 (citing *Progressive W. Ins. Co. v. Dallo*, 2007 WL 3225439, at *5 (S.D. Cal. Oct. 30, 2007) and *Scottsdale Ins. Co. v. MV Transportation*, 36 Cal. 4th 643, 656 (2005)).

125.    There is no dispute that ZAIC agreed to provide a defense to Carney subject to a full reservation of rights, including but not limited to the right to withdraw from that defense and disclaim any insuring obligation.

126.    The reservation of rights advised Carney that Zurich did not believe the claims in the Lawsuit gave rise to a duty to defend or implicated an indemnity obligation under the Zurich CCIP Policies, and expressly reserved the right to bring a declaratory coverage action to make that determination and to recover all defense costs advanced.

127.    ZAIC has advanced, under reservation, an amount in excess of $5 Million for the defense of Carney on the Derivative Claims.

128.    ZAIC is entitled to reimbursement of all the defense costs and fees advanced to Carney in the Lawsuit.

**WHEREFORE**, Zurich American Insurance Company respectfully requests that this Court enter judgment in its favor and against Thomas P. Carney, Inc. for the sum of all defense costs and expenses advanced by Zurich American Insurance Company to or on behalf of Thomas P. Carney, Inc. in the consolidated actions styled *Chestlen Development, LP v. Tutor Perini Building Corp*., Philadelphia Court of Common Pleas, January Term, 2021, No. 00645 and *Tutor Perini Building Corp. v. Chestlen Development, LP*, Philadelphia Court of Common Pleas, December Term, 2020, No. 00207 under Zurich American Insurance Company Contractor Controlled Insurance Program Policy No. GLO 5819877-00,  plus interest on those amounts, and grant such other and further relief as the Court may deem just or proper under the circumstances.

Respectfully Submitted,

By: /s/ Louis A. Bové
LOUIS A. BOVÉ, ESQUIRE
PA BAR I.D. NO. 53071
**BODELL BOVE, LLC**
1845 Walnut Street, 11th Fl., Suite 1100
Philadelphia, PA 19103
Tel: (215) 864-6600
Facsimile: (215) 864-6610
lbove@bodellbove.com
*Attorneys for Zurich American Insurance Company and*
*American Guarantee & Liability Insurance Company*

Date: December 9, 2025